Argued 13 Feb., decided 17 April, 1905; rehearing denied 30 Jan., 1906.

## MAFFET *v.* OREGON & CAL. RAILROAD CO.

80 Pac. 489.

VENDOR AND PURCHASER—CONSTRUCTION OF CONTRACT—CHARACTER OF ESTATE INTENDED BY THE PARTIES TO BE CONVEYED.

1. A contract by a grantee of public land under an act of congress to convey "unto the second party, their heirs and assigns (upon request and surrender of this contract, provided the said party of the first part

shall have then received the patent therefor from the United States, and when said lands hereby contracted to be sold shall have been patented to said party of the first part), a deed conveying all the right, title, and interest of the first party in and to said premises," manifestly contemplates that the purchaser is to receive the fee simple title, and not a qualified or inferior right to the land, unless it should be mineral, in view of the terms of the government grant as stated in 14 Stat. U. S. c. 242.

TIME AS ESSENCE OF CONTRACT—INCREASED INTEREST AFTER DEFAULT—CONSTRUCTION OF FORFEITURE CLAUSE.

2. A contract for the conveyance of land providing for payment by installments with interest, that a higher interest shall be paid if any installment becomes overdue, declaring time to be of the essence of the agreement, and that upon a failure to make any payment when due the contract shall become null and void, and all rights of the vendee shall cease without any declaration of forfeiture or act of re-entry or any other act by the vendor to be performed, is self-forfeiting, and the provision for higher interest upon a failure to make any payment when due is not a penalty available to the vendee as condition of avoiding the forfeiture.

WAIVER OF CONDITIONS BY VENDOR.

3. Conditions for the benefit of the vendor in a contract of sale, as, the right to forfeit, or the acceptance of a self-executed forfeiture, may be waived at his option and performance be tendered as stipulated.

HOW WAIVER MAY BE INDICATED.

4. A waiver of self-executing provisions for forfeiture in a contract for the sale of land may be accomplished by an express agreement, or by unequivocal acts or demeanor leading the purchaser to neglect strict and punctual compliance with the terms of the contract in reliance thereon.

REINSTATING CONTRACT AFTER WAIVING FORFEITURE—NOTICE.

5. A vendor who has once waived a forfeiture incurred by the terms of a contract for the sale of land cannot ordinarily again assume his original relations to the vendee, and insist upon the enforcement of the forfeiture, without giving the vendee proper notice of his intention so to do, and reasonable time within which to comply with the demand for payment.

RESCISSION—ACTION FOR PRICE PAID AS MONEY HAD AND RECEIVED.

6. Upon a refusal by a vendor to comply with his contract to sell and convey, the purchaser may also rescind and maintain an action for the purchase money already paid.

This case illustrates the rule: A contract for the sale of land declared time to be of its essence, and provided for a self-executing forfeiture in case of default in payment of any installment of the purchase price. Owing to uncertainty as to the state of the vendor's title, the parties entered into a supplementary agreement whereby further payments were to be dispensed with until such title was settled. In reliance on this later agreement the purchaser refrained from making the additional payments required by the original contract, when the vendor, some years later, and without any notice or request for payment, canceled the contract and forfeited all money paid under its provisions. *Held,* that the purchaser was justified in accepting the rescission, thereby rendering it mutual, and in suing for the price paid as money had and received to his use.

EFFECT OF DESIGNATING A PARTY AS "TRUSTEE"—SURVIVORSHIP.

7. A contract or deed describing parties thereto as "trustees," without explanation, implies a trust in favor of an undisclosed principal; and in enforcing a contract based on such an instrument the survivor must sue alone to the exclusion of the personal representatives of the deceased trustee.

From Multnomah: ARTHUR L. FRAZER, Judge.

Statement by MR. CHIEF JUSTICE WOLVERTON.

Action by William R. Maffet, Jr., trustee, against the Oregon & California Railroad Co. to recover sundry sums had and re-

ceived by defendant to plaintiff's use, resulting in a judgment for plaintiff in the sum of $21,619.38, from which this appeal is taken.

On December 31, 1889, the defendant as party of the first part, and E. T. McKinney and Wm. R. Maffet, Jr., trustees, of the second part, made and entered into a contract whereby the defendant agreed to sell and McKinney and Maffet to purchase 5,172.28 acres of land lying in the place and indemnity limits of the grant by congress by act of July 25, 1866, to the first party, for the sum and price of $64,362.07, payable as follows: $6,436.20 on the day of the execution of the contract, and the balance, or $57,925.87, on December 31, 1894, with interest on such balance at the rate of 7 per cent per annum, payable annually in the mean while, being $4,054.81 December 31, 1890, $4,054.81 December 31, 1891, $4,054.81 December 31, 1892, $4,054.81 December 31, 1893, and $4,054.81 December 31, 1894. Other stipulations, so far as it is necessary to set them forth, are as follows:

"The party of the second part (McKinney and Maffet) may at any time pay the agreed price of either of said tracts separately as shown by the schedule, * * and shall thereupon be entitled to a conveyance of all the right, title and interest of the first party (the O. & C. Railroad Co.) therein, and the second party shall not cut or remove, nor allow to be cut or removed, any timber from either of said tracts of land without first paying such agreed price thereof, otherwise the whole of said sum of $57,925.87 shall become immediately due and payable. * * And if any of the said sums, either of principal or interest, shall not be paid at the dates above specified, then such sums shall bear interest in gold coin from such dates at the rate of ten per cent per annum, payable annually until payment.

"And the second party in consideration of the premises hereby agrees * * that they will make punctual payment of the above sums as each of them respectively becomes due. * * In case the second party, their legal representatives or assigns, shall pay the several sums of money aforesaid punctually and at the times above limited, and shall strictly and literally perform all and singular the agreements and stipulations aforesaid, according to their true tenor and intent, then the first party will cause to be made and executed unto the second party, their heirs and assigns (upon request and surrender of this contract, provided the said party of the first part shall have then received a patent

therefor from the United States, and when said lands hereby contracted to be sold shall have been patented to the said party of the first part), a deed conveying all the right, title and interest of the party of the first part in and to said premises. * *

"And it is hereby agreed and covenanted by the parties hereto that the times of the payments are of the essence of this contract. And in case the second party shall fail to make the payments aforesaid, and each of them, punctually and upon the strict terms and times above limited, and likewise to perform and complete all and each of the agreements and stipulations aforesaid strictly and literally, without any failure or default, then this contract, so far as it may bind the first party, shall become utterly null and void, and all rights and interests hereby created or then existing in favor of the second party, or derived from them, shall utterly cease and determine, and the right of possession and all legal and equitable interests in the premises hereby contracted shall revert to and revest in said first party, without any declaration of forfeiture or act of re-entry, or any other act by said first party to be performed, and without any right of said second party of reclamation or compensation for moneys paid or services performed, as absolutely, fully and perfectly as if this contract had never been made.

"And said party of the first part shall have the right immediately upon the failure of the party of the second part to comply with the stipulations of this contract, or any one of them, to enter upon the land aforesaid, and take immediate possession thereof, together with the improvements and appurtenances thereto belonging. And the said party of the second part covenants and agrees that they will surrender unto said party of the first part the said lands and appurtenances without delay or hindrance, and no court shall relieve the party of the second part from the failure to comply strictly and literally with this contract."

The plaintiff, for cause of action, sets out this contract, and alleges, in substance, that the vendees paid to defendant in pursuance thereof $6,436.20 December 31, 1889, as part payment of the purchase price, and thereafter paid further sums as follows: $2,027.41 March 2, 1891, $202.75 September 21, 1891, $1,000 December 30, 1891, $1,027.10 January 28, 1892, and $1,000 July 25, 1892; all of which were received, accepted, and retained by defendant. Then, after detailing certain matters tending to render it more or less uncertain and questionable whether defendant would be able shortly to obtain its title from

the general government, as it claimed, by virtue of the said act
of congress, it is further alleged that in view and consideration
of the complications thus arising, and of a doubt occasioned
thereby as to the ability of the defendant to establish its title to
all or any of the lands described in said contract, or to obtain
patents therefor from the United States on or before the time
fixed for the last payments of principal and interest, and in
further consideration that each of the parties to said contract
would waive and forego its or their rights to a strict and literal
performance of the terms and of the stipulations and provisions
making time of the essence thereof, and for the convenience
and interests of each of the parties thereto, they did, on or about
July 25, 1892, make and enter into a mutual understanding,
arrangement, and agreement, whereby it was agreed that no
further payments of interest or principal nor any demand for
conveyance of the title to any of such lands should be made
until the right of the company to the whole should be finally
established and patents issued therefor, and it should be in a
condition to convey an indefeasible title thereto in fee simple,
and that every right to a strict and literal performance of the
terms stipulations and provisions of the said contract in be-
half of either or both of said parties should be annulled, and
thereby waived and renounced; that the right of defendant to
any portion of said lands was not finally established until the
decree of the Supreme Court of the United States, rendered
about January 8, 1900; that the right to that portion of the same
included in the Bull Run Reserve, set aside by the President as
a public reserve, has never yet been established or recognized by
the United States government; and that the equitable title of
Himpel and Neppach, as his assignee, in a portion of said lands,
so remained in them until May 10, 1900; but that, notwith-
standing such conditions as to the title, and prior to any patent
having been issued by the general government to the defendant
to any portion of said lands, the defendant, on March 27, 1900,
wrongfully and fraudulently broke said contract, refused to
perform and repudiated, rescinded and canceled the same by a
written notice to plaintiff and McKinney, trustees, in form as
follows:

"Referring to the former contract number 3,354, of date December 31, 1889, made with you by the Oregon & California Railroad Co. for the sale of certain lands in said former contract described, this is to notify you that the company hereby forfeits and cancels said contract for failure upon your part to comply with the terms and conditions, to-wit: failure to make payment of the purchase price, and you are hereby notified that said contract is no longer of any force and effect."

Continuing, it is alleged that ever since the giving of said notice the defendant has claimed and asserted that said contract was forfeited and canceled, and has refused to recognize the same as operative and binding; that E. T. McKinney, trustee, has died since the execution thereof, and that plaintiff is now the sole surviving trustee; that prior to the commencement of this action plaintiff demanded repayment of the several sums paid to defendant under said contract, with interest at the rate of 8 per cent per annum, amounting in the aggregate to $21,619.38, which was refused; and that by reason of the premises defendant is indebted to plaintiff in the sum stated, for which amount judgment is prayed.

The defendant demurred to the complaint, assigning three grounds therefor: First, that it does not state facts; second, that plaintiff has not legal capacity to sue, and that there is a defect of parties, in that plaintiff cannot sue without joining with him the personal representatives of E. T. McKinney, deceased; and, third, that the cause, if any plaintiff has, accrued more than six years prior to the commencement of the action. The demurrer being overruled, the defendant answered. The answer admits the execution of the contract virtually as alleged, and the payments, but denies all inducement set out leading to the alleged waiver agreement, or that such an understanding arrangement or agreement was ever entered into, or that defendant in any manner broke the said contract of December 31, 1889, by refusing to perform, or that it rescinded or canceled the same by written or other notice, but alleges that on the 27th day of March, 1900, it did, by reason of the failure and default of the vendees to pay the purchase price of said lands in accordance with their agreement so to do, and to keep and perform the terms of said contract on their part, send to the plaintiff the

written notice referred to, and thereby gave them formal notice that said contract was no longer of any force or effect because of such failure on their part to comply with its terms. They also deny the further allegations of the complaint and set up three separate defenses, which need not be stated at this time. Upon this state of the record plaintiff moved for judgment in his favor and against the defendant for the amount prayed for, which motion being allowed the defendant appeals.

REVERSED.

For appellant there was a brief over the name of *William David Fenton,* with an oral argument by *Mr. Fenton* and *Mr. William Coleman Bristol.*

For respondent there were briefs over the names of *Watson, Beekman & Watson, George William Pyle Joseph,* and *Dolph, Mallory, Simon & Gearin,* with oral arguments by *Mr. Edward Byers Watson* and *Mr. John M. Gearin.*

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

Under the pleadings there are virtually but two contentions: One on the part of the defendant that the complaint does not state facts sufficient to constitute the cause of action preferred— that is, for money had and received, as if the defendant had wrongfully rescinded the contract; and the other, on the part of the plaintiff, that he is entitled to a judgment on the pleadings, because it is urged the answer virtually admits plaintiff's right of recovery.

1. The gravamen of the defendant's contention as to the insufficiency of the complaint, if we fully understand it, is that by the alleged compromise agreement, which, for the purposes of the question in hand, must be taken as having been duly and regularly entered into, the plaintiff has ratified, sanctioned and affirmed the original contract, so that he was no longer or subsequently entitled to rescind, that the position thus voluntarily assumed rigidly bound him to the contract, and for any subsequent violation of it on the part of the defendant the only action open to him was for a breach, and that under no conditions would he be allowed to rescind, and then sue for a return of the

purchase money, as if no contract had ever been entered into. To get our bearings, we must first look to the contract to determine its true import and meaning, for by it the parties were wholly to be governed in their subsequent dealings with each other. We need to notice but two features. A clause provides that the vendees may at any time pay the agreed price of any of the designated tracts separately, as per schedule attached, and thereupon be entitled to a conveyance of all the right, title and interest of the railroad company therein. A subsequent clause provides that, in case the vendees, their legal representatives or assigns, shall pay the several sums of money agreed upon punctually and at the times limited, and shall strictly and literally perform, etc., then that the railroad company will cause to be made and executed unto the vendees, their heirs and assigns (upon request and surrender of the contract, providing the railroad company had then received and obtained from the United States a patent thereto, and when said lands thereby contracted to be sold shall have been patented to the railroad company), a deed conveying all the right, title, and interest of the company in and to said premises.

The question for consideration is whether the railroad company contracted to sell and convey to the vendees the entire fee-simple interest in the lands described, or merely its right, title and interest therein at the time, be that what it may. It is well understood extraneously that the company was earning and procuring these lands from the general government through the act of congress of July 25, 1866. The parties were negotiating with reference to the title to be thus acquired. The general government being the source of all true title to the public domain must be presumed, and it was no doubt the idea that possessed the minds of both vendor and purchasers that they were dealing with reference to a conveyance of the fee-simple or ultimate title to the premises, barring only such reservations as may have been withheld by congress, the act having reserved nothing except that mineral lands were not to be included: 14 Stat. U. S. c. 242, p. 239. It is impossible to discern, under the attending circumstances, that the parties had in mind any other or lesser title than this. By the clause first in order one would naturally

infer that it was the purpose of the company to execute a deed at once to the purchasers to any parcel of the land included in the contract upon which they might elect to pay the scheduled price. The clause does not say that, however, but only that the purchaser shall be entitled to a conveyance of all the right, title and interest of the company. But when? If read in pari materia with the subsequent provisions upon the subject—which we are inclined to think it should be—it becomes at once manifest that it was not the intendment that any deed should be executed or delivered to the purchasers, their personal representatives or assigns, until the patent had first been issued to the company by the general government. But whether this clause applies to parcels separately paid for or not, the stipulation makes it absolutely clear that where it is sought by the purchasers to pay the full purchase price, and otherwise perform, so as to entitle them to a deed to all the lands, one would not be demandable until the company had first acquired a patent from the general government. So that, looking to the species of title the company expected to acquire, and the ultimate performance on its part by a conveyance of all its right, title, and interest, it follows by irresistible sequence that the parties were dealing with reference to the fee-simple or ultimate title, and not to any qualified right or interest therein less than the whole.

2. As to the other feature, the contract provides that the balance of the purchase price shall be paid on the 31st of December, 1894, with interest thereon in the mean time at the rate of 7 per cent per annum, payable annually, counting from the date of the first payment, to-wit, December 31, 1889. On December 31, 1890, therefore, $4,054.81 became payable, and a like amount on the 31st of December of each succeeding year to and inclusive of December 31, 1894, when the balance was payable. It further provides, following some intervening stipulations, that if any of the said sums, either of principal or interest, shall not be paid at the dates specified, then that such sums shall bear interest at the rate of 10 per cent per annum. Then follow varying, explicit and positive provisions touching the strict and literal performance of the contract on the part of the purchasers, and with a view to making time of the essence of the contract. Now, it is

strenuously insisted on the part of plaintiff that the stipulation as to the increased rate of interest to be paid on defaulted or overdue payments is within itself a waiver on the part of the company of any default that might be incurred on the part of the purchasers by reason of any failure to meet payments on the dates specified. We cannot concur in this view. The clause must be construed, of course, in connection with the other clauses in the contract relating to the subject of forfeiture, and when so construed the true intendment is perfectly manifest. The provisions respecting a strict and literal performance on the part of the vendees going to emphasize the direct and positive stipulation that time shall be of the essence of the contract are so numerous, and asserted with such varying stress and impressiveness, that there can be no mistake as to their real purpose. They even go to the utmost verge of declaring that the courts shall not relieve the purchasers from their failure to observe their conditions exactly and punctually.

3. These stipulations were inserted wholly and solely for the benefit of the vendor. They could not serve the purchasers in any way, as the latter would be precluded from taking the least advantage of their own default. Being for the benefit of the vendor, it might, if it so desired, waive their strict and literal observance on the part of the purchasers, and this it could do in advance of the time of agreed performance. So it could, if it saw fit to, forego a forfeiture already incurred, and thereafter accept performance, and itself perform as if no default had taken place. The matter, therefore, of requiring exact performance on the part of the purchasers, lies wholly within the option or election of the vendor: *Dana* v. *St. Paul Invest. Co.* 42 Minn. 194 (44 N. W. 55); *Chambers* v. *Anderson,* 51 Kan. 385 (32 Pac. 1098); *Cartwright* v. *Gardner,* 5 Cush. 273, 281; *Manning* v. *Brown,* 10 Me. 49; *Mason* v. *Caldwell,* 5 Gilm. 196 (48 Am. Dec. 330); *Church* v. *Ayres,* 5 Cow. 272; *Wilcoxson* v. *Stitt,* 65 Cal. 596 (4 Pac. 629, 52 Am. Rep. 310). Seeing that such is the purpose of inserting the time-essence conditions, it becomes at once apparent why the clause providing for payment of the increased rate of interest in case the stipulated payments were not punctually made was inserted. It subserves two pur-

poses: (1) As a pressure to induce prompt payments on the part of the purchasers, and (2) to increase the vendor's compensation should it see fit to waive strict performance or a forfeiture, should one have been incurred. Nor does it signify an intendment, notwithstanding the provisions for prompt performance, that they should not be strictly observed, but was inserted so that, in case the vendor should choose to waive such observance, he might be entitled to a greater percentage of interest for his indulgence. In this view it is not inconsistent with the other provisions under discussion, as all can subserve their especial purposes without the least inharmony.

*O'Connor* v. *Hughes,* 35 Minn. 446 (29 N. W. 152), so implicitly relied upon by respondent, is not in conflict with this interpretation, for in that case the contract provided that, if there was any default in strict performance, the vendor should have the right at his election to declare it null and void; and it was held that, in the absence of a determination on the part of the vendor to require strict performance and of reasonable notice of such election on his part, the mere default of the vendee in making the specified payments would not operate to extinguish his equitable rights, and that a subsequent declaration of forfeiture by the vendor, without notice and reasonable opportunity to make payment, was also ineffectual. The difference between the two contracts is manifest and vital. By the one we are construing, a forfeiture is incurred upon default in payment at once, and by force of positive stipulations to that effect; but in that one the vendor was accorded the right, at his election, to declare the contract null and void on account of the default, and without such declaration properly and timely made there could be no forfeiture. It is true that in the course of construing the contract the clause respecting overdue payments drawing an increased rate of interest was considered among the rest as indicating as well an intendment that the default was not of itself to work a forfeiture. This, however, was natural, for the forfeiture was not made to depend merely upon the failure of payment strictly and punctually at the time specified, but upon the election also of the vendor to declare the contract null and void. If he should have permitted the contract

to run on after default without declaring a forfeiture, then it was the intendment that he should be entitled to the increased rate of interest on defaulted payments. So it is here, if the vendor elects to waive the time of payment or a forfeiture that has been incurred by force of the very terms of the contract itself, as distinguished from electing to declare a forfeiture, as in that contract contemplated, then it was the intendment that he should be entitled to the increased interest. The difference is, we state it again, that in the one case the vendor must elect to declare the forfeiture for a default of the purchaser, without which the contract runs on, remains operative, and in the other he might, if he so elects, waive the default and forfeiture that follow by force of the contract without any act of his; and in case of such election we say he is entitled to the increased rate of interest, and there is no incongruity with the idea of strict performance. If the contract does not mean this, the increased interest clause would, in effect, operate to nullify all the repeated, positive and unequivocal stipulations inserted with the unmistakable purpose of making time of the essence of the contract by its own terms unconditional upon any act of the vendor. *Burroughs* v. *Jones,* 79 Miss. 214-218 (30 South. 605), seems to give a like construction to a similar contract. By the adjudications, both at law and in equity, the effect of such time-essence stipulations, terminating the contract upon a failure to comply strictly and punctually with its conditions, is to entail a forfeiture by sheer force of the contract itself upon the mere default of the purchasers by their failure to make payments at the times designated as they obligated themselves to do: 2 Warvelle, Vendors (2 ed.), § 813; *Snider* v. *Lehnherr,* 5 Or. 385; *Cleary* v. *Folger,* 84 Cal. 316-319 (24 Pac. 280, 18 Am. St. Rep. 187); *Martin* v. *Morgan,* 87 Cal. 203 (25 Pac. 350, 22 Am. St. Rep. 240); *Foot* v. *Bush,* 72 Iowa, 522 (69 N. W. 874); *Wells* v. *Smith,* 2 Edw. Ch. 78; *Dauchy* v. *Pond,* 9 Watts, 49; *Benedict* v. *Lynch,* 1 Johns. Ch. 370 (7 Am. Dec. 484); *Cartwright* v. *Gardner,* 5 Cush. 273; *Drown* v. *Ingels,* 3 Wash. St. 424 (28 Pac. 759).

There is some divergency of opinion as to when and under what conditions equity will relieve against a default in punctual

payment, even though time may seem to be made of the essence of the contract, owing to the principle of equitable conversion and consequent vesting of the equitable title to realty in the vendee: 1 Pomeroy, Eq. Juris. § 454. But, however this may be, it is plain that the law affords no such relief. In that forum all payments to be made prior to the time in which it is agreed that title shall pass, where time is made material, are conditions precedent, and, unless made promptly, the payee is without right of relief. *Haggerty* v. *Elyton Land Co.* 89 Ala. 428 (7 South. 651), affords an apt illustration showing the distinguishing characteristics as between the equitable and the legal right. The court says: "By the contract of sale an equitable interest vested in Haggerty and in respect to the forfeiture of this equitable interest—that is, of the money consideration paid and the materials furnished and work done upon the improvements—the condition may be regarded as subsequent. By the express terms of the bond for title he did not and could not become entitled to a conveyance of the legal estate, except by performance of the condition: as to this it is precedent." But in that case the court refused to grant relief, although in equity, because time had been made of the essence of the contract. So that under the contract in question, forfeiture having been entailed by force of the stipulations of the parties to that effect, without more—that is, without any affirmative act on the part of the railroad company—it was at liberty to re-enter and retake possession of the lands at once upon the happening of default in payment upon the part of the purchasers, providing the contractual relations remained the same.

4. The railroad company could, however, waive a default or consequent forfeiture, if it so desired, which, as we have seen, is a matter of its own choice or election. This it might do by express agreement to that purpose, or it might do it by unequivocal acts or demeanor affording reasonable and proper inducement for the purchasers in reliance thereon to alter their course as to strict and punctual compliance: 2 Warvelle, Vendors (2 ed.), §§ 819, 820, 821; *Neppach* v. *Oregon & Cal. R. Co.* 46 Or. 374 (80 Pac. 482) ; *Baker* v. *Bishop Hill Colony,* 45 Ill. 264; *Watson* v. *White,* 152 Ill. 364 (38 N. E. 902) ; *Mouson* v. *Bragdon,* 159 Ill. 61 (42

N. E. 383) ; *Thayer* v. *Meeker,* 86 Ill. 470; *Wheeling Gas Co.* v. *Elder,* 54 W. Va. 335 (46 S. E. 357).

5. But, if the waiver was once accomplished, the vendor could not again assume the original relations, and insist upon a for-feiture, unless upon a subsequent default, not within the pur-view of the waiver, without giving the purchasers proper notice of its intention so to do and a reasonable time in which to com-ply with the demand for payment: *Watson* v. *White,* 152 Ill. 364 (38 N. E. 902) ; *Mouson* v. *Bragdon,* 159 Ill. 61 (42 N. E. 383) ; *Eaton* v. *Schneider,* 185 Ill. 508 (57 N. E. 421) ; *Thayer* v. *Meeker,* 86 Ill. 470; *O'Connor* v. *Hughes,* 35 Minn. 446 (29 N. W. 152).

6. With this understanding of the contract and its effect as to the rights of the parties, we may determine whether, under the complaint as tested by the demurrer, the plaintiff is entitled to recover. This waiver agreement, when acted upon, would be operative at least as a waiver of prompt payment as per the stipulations in the contract, if it was not in reality a modifica-tion or an ingrafting of new and different conditions upon the contract itself. The parties so treating with reference to the original contract knowing all the attending conditions, it might be conceded, as contended by defendant, we think, but without deciding, that it was tantamount to a ratification or affirmance of the contract at that time; but it does not follow that there might not thereafter be a rescission by the mutual agreement of the parties, express or implied: *Owen* v. *Pomona Land Co.* 131 Cal. 530 (63 Pac. 850, 64 Pac. 253). It should be noted in this connection that there was nothing for the purchasers to return to the end that they might place the vendor in statu quo. They had received nothing at its hands, except, perhaps, they might have gone into possession of the property, which they had a right to do under the contract. Being prevented by their own under-taking from removing any timber from the lands, we must pre-sume that they have not broken the contract in that respect. So that they have received nothing which they would be required to return to the company in order to place it in statu quo as a condition to a rescission on their part, nor has the company been put to any expense or inconvenience by sufferance of the pur-

chasers.   The complaint proceeds upon the theory that, while the contract was still operative, being so continued by virtue of the alleged waiver agreement, the defendant, without right, by the notice of March 27, 1900, repudiated and rescinded such contract; and the plaintiff, taking it at its word, assented thereto, and thus by mutual agreement rescinded, which entitled plaintiff to a return of the money paid on the faith of the contract.   Taking it, therefore, for granted that the agreement for a waiver as to time of payments until patents issued to the defendant was made as alleged, the notice of March 27, 1900, was a palpable repudiation of all existing contractual relations between the parties, and in consequence tantamount to a rescission on the part of the company.   The notice refers, it is true, to the "former contract" of December 31, 1889, but it forfeits and cancels said contract for failure to make payment of the purchase price as agreed upon, which, if of any force by virtue of the waiver agreement, was a virtual rescission in toto.   The plaintiff had a right, under the attending conditions, notwithstanding any ratification or reaffirmance of the contract as first entered into, to say to the company: "Very well, since you refuse to be bound further by your engagements, I assent to your rescission."   This the law says is, in effect, a mutual rescission.

Treating the defendant's declaration that the contract is canceled, and no longer of any force or effect, as an abandonment, the plaintiff might himself abandon, and, the contract having thus come to an end, he might very well, as he has done, sue at law to recover what he has paid: *Glock* v. *Howard & W. Colony Co.* 123 Cal. 1, 10 (55 Pac. 713, 719, 43 L. R. A. 199, 69 Am. St. Rep. 17).   Mr. Justice HENSHAW, in further consideration of this case, says: "There have been many cases before this court involving the rights of parties to agreements for the sale and purchase of real estate, in which it has been held that, after the parties have rescinded the agreement or mutually agreed to abandon, the vendee may recover the money which he paid in part performance of his contract"; citing cases.   This court, however, has settled the principle by the language of Mr. Chief Justice MOORE in *Graham* v. *Merchant,* 43 Or. 294, 304 (72 Pac. 1088, 1090), as follows: "When a vendor abandons his con-

tract to convey, the vendee, in his choice of remedies, may elect to rescind the contract, and thereupon maintain an action at law to recover what he has paid thereon as money had and received." Thus it is that an abandonment by one party may be treated as a proposition to rescind by the other and thereupon he may also abandon, and thus arrive at a mutual agreement to rescind, and the law so treats the correlative acts of the parties: 2 Warvelle, Vendors (2 ed), § 826; *Cummings* v. *Rogers,* 36 Minn. 317 (30 N. W. 892) ; *Wheelden* v. *Fiske,* 50 N. H. 125. The parties could as well rescind a ratified or reaffirmed contract by mutual agreement, there being nothing to return or do in order to reinstate statu quo conditions, as they could the original, and, having so mutually rescinded here, the plaintiff was entitled to maintain the action.

7. Another objection is urged to the complaint, namely, that the action is being prosecuted by Maffet in a representative capacity as trustee, when it is insisted that it should have been instituted by him individually, or rather in such latter capacity, having joined with him the survivors of McKinney, deceased, neither of which requisites to the maintenance of the action has been observed. The contention is based upon the premise that the term "trustees" was used in the contract as descriptiones personarum. Prima facie, however, the term, without more, implies a trust in favor of an undisclosed beneficiary, and hence we cannot say, from the face of the contract itself, that plaintiff and McKinney were not in fact trustees, and the complaint is good against the objection. If trustees, the survivor must, it is admitted, sue in exclusion of the personal representatives of the deceased co-trustee: Perry, Trusts (5 ed.), § 158; *Sturtevant* v. *Jacques,* 14 Allen, 523; *Shaw* v. *Spencer,* 100 Mass. 382 (97 Am. Dec. 107, 1 Am. Rep. 115). Under the construction we have given the contract, and considering also the effect of the alleged waiver agreement, the third ground of demurrer is without relevancy or force. The demurrer was therefore properly overruled.

This brings us to the question arising upon the motion for judgment on the pleadings. The argument of plaintiff in support of the motion is that the alleged agreement as to the waiver

of the time-essence stipulations should be treated as if not asserted in the complaint, and when so treated he is entitled to judgment notwithstanding the answer of the defendant, which seems to controvert none of the allegations of the complaint material to this inquiry, except those relating to such agreement. It proceeds upon the theory that the contract, construed as a whole—that is, considering the clause providing for the payment by the purchasers of an increased rate of interest in case they failed to make their payments punctually with those other provisions calculated in themselves to make time strictly of the essence of the contract—signifies an ultimate intendment that the purchasers might make the payments at any time, and that they would not incur a forfeiture so long as the vendor did not itself elect to declare it, and that, so construed, there had been no default or forfeiture on the part of the purchasers when the defendant gave the notice of March 27, 1900, declaring the contract canceled, and no longer in force or effect. Such, however, is not, as we have shown, the reasonable and proper interpretation of the contract under the authorities. Barring the alleged agreement of July 25, 1892, a forfeiture took place by force of the terms and stipulations of the contract when the purchasers failed to pay the interest installments as they became due. By the acceptance of payments on the first and second installments after they became due and payable, it might be that the company waived these defaults; but otherwise it has done nothing that could be construed into a waiver of the third and subsequent installments. Thus it would appear that the contract had been forfeited long before the notice of cancellation was given. But, as the forfeiture did not depend upon the vendor's election to forfeit, but took place by the terms of the contract itself, the notice meant nothing more than an intendment to insist upon a right to which the company was entitled without it. It could hardly be considered that under such conditions the notice was in itself a waiver of the defaults and consequent forfeiture, and at the same time an election on the part of the railroad company to forfeit the contract, so that in this view, it was absolutely essential to the statement of a good cause of action that the complaint show, by apt allegations, a

waiver in some manner by the railroad company of the default in payments and the forfeiture of the contract on the part of the purchasers consequent upon such default. This the plaintiff did, however, by setting up the agreement to postpone an insistence upon punctual payments until defendant was ready to convey its title to be acquired from the general government, which, being negatived by the answer, an issue was thus raised that should have been tried out.

There was error, therefore, in allowing the motion for judgment on the pleadings, for which the judgment of the circuit court will be reversed, and the cause remanded for such other proceedings as may seem proper.        REVERSED.